IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| TAMMY WOODS O.B.O. T.J., a minor child, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No. 6:14-cv-03308-NKL ) |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | ) ) ) ) ) |
| Defendant. | ) |

**ORDER**

Before the Court is Tammy Woods'[1] appeal of the Commissioner of Social Security's final decision denying her minor son's application for supplemental security income under Title XVI of the Social Security Act. [Doc. 8]. For the following reasons, the Commissioner's decision is reversed, and the case is remanded for further consideration consistent with this Order.

**I.  Background**

T.J. was born in November 1996. On T.J.'s behalf, Ms. Woods filed an application for supplemental security income under Title XVI of the Social Security Act on November 29, 2011, alleging disability due to epilepsy and mental impairments

---

[1] Tammy Woods filed an application for supplement security income on behalf of her minor son, T.J. T.J. is the Plaintiff in this case on whose behalf Tammy Woods filed the application and now appeals the Commissioner's decision.

1

including bipolar disorder, oppositional defiant disorder, attention deficit hyperactivity disorder (ADHD), aggression, and depression. [Tr. 186].

### A. Medical and Disciplinary History

T.J. has a history of behavioral problems. In the 2005-2006 school year, T.J. was disciplined eighteen times between October and March. In March 2010, T.J. was suspended from school for ten days for making threats to other students. [Tr. 293]. In September 2010, T.J. tried to run away from school and refused to go back to his classroom. He was eating paper and pencil lead. [Tr. 292]. His mother and the police were called, he was suspended for the rest of the day, and he was referred to the juvenile office. *Id.* On at least three occasions in 2011, T.J. was disciplined for disrupting class, inappropriate contact with another student, choking another student, threatening to kill a student, making inappropriate sexual comments to a student, pushing teachers, destroying school property, and throwing a chair at his teacher. [Tr. 79, 203]. On the last occasion in 2011, T.J. was suspended for a substantial period of time and at one point faced charges for assaulting a teacher and destroying school property. [Tr. 472]. He was hospitalized for inpatient care at Heartland Center for Behavioral Change from September 28 to October 5, 2011. In December 2011, a nurse noticed T.J. constantly picking at and aggravating his two year old brother. [Tr. 463]. In February 2013, Dr. Harcharan Bains, M.D., who controlled T.J. mental health medication since October 2011, wrote that T.J. was easily irritated by his little brother, has verbal outbursts toward him, plays rough with him, and takes things from him. [Tr. 521]. At his hearing in May

2

2013, T.J. testified that his first year of high school went "pretty good," [Tr. 44], but that he got into five physical fights with five different people that year. [Tr. 46-50].

Medical records from Dr. Bains reveal periods of improvement and regression. In November 2011, January, March, June, July, August, September, and October 2012, and March 2013, T.J.'s records documented improved mood and depression and unremarkable findings. [Tr. 454, 460, 466, 528, 531, 537, 540, 543, 576]. In October, November, and December 2011, March, May, August, and December 2012, and January and February 2013, T.J. or his mother reported an increase in or the return of mood swings, crying spells, verbal outbursts and aggression, physical aggression, or depression. [Tr. 448, 451, 457, 463, 468, 471, 521, 524, 526, 534]. Some of those same records revealed improvements in one area and the return of behaviors in another area. For instance, in February 2013, T.J.'s depression was improved, his grades were good, and he did not experience mood swings, but he was tearful and had verbal outbursts toward his little brother. [Tr. 521]. Between October 2011 and March 2013, Dr. Bains increased or altered T.J.'s medication eight times. [Tr. 448, 451, 457, 463, 468, 471, 521, 537]. Dr. Bennett, T.J.'s primary care physician, saw T.J. for follow-up appointments related to his mental impairments and a variety of illnesses. From October 2011 through August 2012, Dr. Bennett consistently stated that T.J. was "doing okay." [Tr. 421, 423, 425, 427, 431, 433, 558, 564].

### B. Medical and Non-Medical Opinions

The record contains opinions from T.J.'s primary care physician, therapist, eighth grade special education teacher, ninth grade special education teacher, and a combined opinion from a non-examining psychologist and non-examining pediatrician.

Dr. Michael Bennett, M.D., is T.J.'s primary care physician. He primarily treated T.J.'s mental impairments from February 2011 until October 2011, when Dr. Harcharan Bains, M.D., took over management of T.J.'s mental health medication. However, Dr. Bennett continued to see T.J. throughout 2011 and 2012, treating him on approximately twenty occasions for depression, bipolar disorder, ADHD, and various illnesses.

Alicia Humes, LMSW, also treated T.J. through therapy. Although there are limited records regarding her treatment relationship with him, it appears that Ms. Humes treated T.J. from at least September 2011 through March 2013. [Tr. 569-73]. T.J.'s mother testified that Ms. Humes was currently "kind of leaving it at [T.J.'s] call . . . because summer is coming." [Tr. 90]. She testified that T.J. had seen Ms. Humes two weeks prior and two weeks prior to that. *Id.* She testified that T.J. saw Ms. Humes on a biweekly basis or "at least two or three times a month." *Id.*

Ms. Pam Kistenmacher was T.J.'s special education teacher from approximately 2008 to 2012. [Tr. 195]. She taught T.J. communication arts and mathematics. Ms. Kristen Caldwell became T.J.'s special education teacher when he entered high school in the 2012-2013 school year. Though Ms. Humes and T.J.'s teachers are not "acceptable medical sources" whose opinions are entitled "controlling weight" under the regulations, they are nonetheless "other sources" whose opinions can be considered by the ALJ. 20 C.F.R. § 416.913.

4

In June 2012, Ms. Kistenmacher completed a Teacher Questionnaire. She stated that T.J. was in the eighth grade, but performed at a sixth or seventh grade level in reading, a seventh grade level in mathematics, and a fourth grade level in written language. [Tr. 195]. She noted that T.J. had been suspended from school for forty-five days for assaulting adults and destroying school property. [Tr. 198]. She stated T.J. had anger issues, but was "working on them positively." *Id.* Ms. Kistenmacher opined that T.J. had problems in "acquiring and using information," "attending and completing tasks," and "interacting and relating with others." [Tr. 196-99]. T.J. had no problem "moving about and manipulating objects" or "caring for himself."[2] [Tr. 199-200]. She was unsure about his medication schedule. [Tr. 201].

In July 2012, non-examining consultants Dr. Stephen Scher, Ph.D., and Dr. Despine Coulis, M.D., completed a Childhood Disability Evaluation after reviewing T.J.'s school records and various medical records. [Tr. 496-99]. Dr. Bennett, Ms. Humes, and Ms. Kistenmacher individually completed Individual Functional Assessments in August 2012. Ms. Caldwell completed the same assessment in April 2013. They are summarized in the table below:

---

[2] In evaluating a disability for children, the ALJ must determine if the child has an impairment or combination of impairments that meets the listing or functionally equals the severity of the listings. 20 C.F.R. § 416.924(d). The ALJ in this case determined that T.J. did not meet a listing and analyzed whether T.J. functionally equaled the severity of the listings. To "functionally equal the listings" an impairment must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. *Id.* at § 416.926a(a). The ALJ is required to consider how the child functions in his activities in terms of six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and well-being. *Id.* at § 416.926a(b).

|  | Acquiring & Using Information | Attending & Completing Tasks | Interacting & Relating With Others | Moving About & Manipulating Objects | Caring for Yourself | Health & Physical Well-Being |
|---|---|---|---|---|---|---|
| **Drs. Scher & Coulis** [Tr. 496-99] | Less than Marked | Less than Marked | Less than Marked | No Limitations | Less than Marked | Less than Marked |
| **Dr. Bennett** [Tr. 489-90] | Marked | Extreme | Less than Marked | Less than Marked | Marked | Marked |
| **Ms. Humes** [Tr. 492-93] | No Answer | Marked | Marked | Marked | Extreme | Marked |
| **Ms. Kistenmacher** [Tr. 268-69] | Less than Marked | Less than Marked | Less than Marked | No Limitations | No Limitations | Less than Marked |
| **Ms. Caldwell** [Tr. 328-29] | Marked | Extreme | Marked | Marked | Marked | Extreme |

In support of their conclusions, Dr. Scher and Dr. Coulis stated that after hospitalization and medication changes, T.J.'s behavior "appears to have substantially improved . . . during [the] latter half of the year." [Tr. 498]. Dr. Bennett stated that T.J. had decreased concentration and comprehension and poor hygiene. [Tr. 489-90]. Ms. Humes stated that T.J. had poor memory retention, concentration, and comprehension, difficulty following directions and tasks, difficulty obtaining and maintaining relationships, and difficulty expressing feelings. [Tr. 492-93]. She stated that T.J. inappropriately resolved conflict through aggression or self-harm and is unable to work independently or in unstructured settings. [Tr. 493]. Ms. Kistenmacher remarked that T.J. had written expression difficulties and difficulty focusing on a task if it is not interesting. [Tr. 269]. He has had difficulties with authority figures in the past. *Id.* Ms. Caldwell did not elaborate on her opinions.

6

Ms. Humes also submitted a letter in March 2013. Ms. Humes stated that T.J. has been assessed for early signs of violence on three separate occasions and exhibits the following warning signs:

> social withdrawal, excessive feelings of isolation and being alone, excessive feeling of refection, being a victim of violence, feeling of being picked on and persecuted, low school interest and poor . . . academic performance, expression of violence in writing and drawings, uncontrolled anger, patterns and impulsive and chronic hitting, intimidating and bullying behaviors, history of discipline problems, past history of violent and aggressive behavior, intolerance for differences and prejudicial attitudes.

[Tr. 569]. She stated that he was not a threat to his peers or family, but was a threat to himself. T.J.'s prognosis was "guarded as he is presented with many mental health deficits preventing him from achieving self-sufficiency." *Id.*

### C. ALJ's Decision

After a hearing, the ALJ concluded that T.J. suffered from the following severe impairments: affective mood disorder, ADHD, intermittent explosive disorder, and a learning disability in math and reading. [Tr. 18]. The ALJ concluded that T.J.'s impairments did not meet, medically equal, or functionally equal the listings set forth in 20 C.F.R. § 416.924, which require that a child's impairment result in "marked" limitations in two out of six possible functional equivalence domains or an "extreme" limitation in one functional equivalence domain. The ALJ concluded that T.J. had "less than marked limitation[s]" in "acquiring and using information," "attending and completing tasks," and "interacting and relating with others." [Tr. 23-26]. T.J. had "no limitation[s]" in "moving about and manipulating objects," "caring for yourself," and "health and physical well-being." [Tr. 26-28].

In making his conclusion, the ALJ relied on T.J.'s reported activities of daily living, the testimony of T.J. and his mother, reports by various medical professionals, medical records, and reports by T.J.'s teachers. The ALJ stated that despite a history of physical aggression when he was younger, T.J. reported doing well in high school, had shown improvement in dealing with anger, was only in special education classes 25 percent of the time, was a part of the baseball team, had friends, completed chores, and hoped to get a summer job stocking shelves at a grocery store. He was able to pick out his own clothes, dress himself, ride his bike, and play sports.

The ALJ also weighed the reports and opinions submitted by T.J.'s teachers, doctor, and therapist and by the two non-examining, non-treating consultants, discussed above. The ALJ gave the report of Drs. Scher and Coulis, the non-examining consultants, "significant weight" because their conclusion was "well-supported by the narrative analysis accompanying it and is consistent with the overall evidence of record as discussed in detail herein." [Tr. 21-22]. The ALJ gave the opinions of T.J.'s primary care physician, Dr. Michael Bennett, M.D., and therapist, Ms. Alicia Humes, LMSW, "little weight" for reasons discussed in detail below. The ALJ gave part of the opinion of T.J.'s eighth grade special education teacher, Ms. Pam Kistenmacher, "significant weight" because it was consistent with her narrative explanation and other evidence in the record. [Tr. 22]. Ms. Kistenmacher's opinion that T.J. would have "less than marked" limitations in "health and physical well-being" was given "little weight" because it appeared that Ms. Kistenmacher did not understand the requirements of that domain. *Id.* The ALJ gave the opinion of T.J.'s high school special education teacher,

8

Ms. Kristen Caldwell, "little weight" because "the opinion is not consistent with the claimant's performance in high school, the statements in his Individualized Educational Program from high school, or the treatment notes of his medical providers." [Tr. 23].

## II. Discussion

Woods argues that the Commissioner's decision is not supported by substantial evidence because the ALJ did not properly consider the opinions of T.J.'s treating physician, Dr. Bennett, and his therapist, Ms. Humes. "A treating physician's opinion is given 'controlling weight' if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005). An ALJ may disregard or discount a treating physician's opinion where other medical assessments are supported by better or more thorough medical evidence or where the treating physician renders inconsistent opinions. *Id.* In any case, the ALJ must provide good reasons for the weight given to a treating source's opinion. 20 C.F.R. § 416.927(c)(2); *see also Brown v. Astrue*, 611 F.3d 941, 951-52 (8th Cir. 2010). "The opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence." *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998); *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010); *Cox v. Barnhart*, 345 F.3d 606, 610 (8th Cir. 2003).

The ALJ concluded that Dr. Bennett's opinion was due "little weight" because his treatment notes did not document marked and extreme limitations. [Tr. 22]. While Dr. Bennett's medical records consistently document that he is stable or "doing okay," [Tr. 421, 423, 425, 427, 431, 433, 558, 564], the Eighth Circuit has stated that an ALJ cannot

9

rely too heavily on indications in the medical record that a claimant is "doing well" because "doing well for the purposes of a treatment program has no necessary relation to a claimant's ability to work." *Hutsell v. Massanari*, 259 F.3d 707, 712 (8th Cir. 2001). This same logic can be applied to this case, where statements that T.J. was "doing okay" are arguably less of an affirmative statement of ability to function without marked or extreme limitations than "doing well." Further, Dr. Bennett's notes from early to mid-2011, when T.J. was disciplined in school for physical aggression and for making threats and inappropriate sexual comments also state that he is "doing okay," suggesting that Dr. Bennett did not mean "doing okay" to mean fully functional or completely well. *See e.g.*, [Tr. 391, 399, 401, 411].

Further, even if Dr. Bennett's treatment notes do not support the limitations he assessed, his opinions are consistent with Dr. Bain's medical records and with the opinions of Ms. Humes and Ms. Caldwell. As discussed above, Dr. Bains' medical records reflect periods of improvement and periods of regression. Even after five months of unremarkable medical records from Dr. Bains in 2012, records from late 2012 and early 2013 indicate T.J.'s medication was still being adjusted and that he was tearful, angered easily, and had verbal outbursts. [Tr. 521, 524, 526]. This pattern is consistent with the Eighth Circuit's observation that "one characteristic of mental illness is the presence of occasional symptom-free periods." *Brown v. Astrue*, 611 F.3d 941, 954 (8th Cir. 2010); *Andler v. Chater*, 100 F.3d 1389, 1393 (8th Cir. 1996). Likewise, T.J. reported doing well during the 2012-2013 school year, but also reported getting into five physical fights.

10

Dr. Bennett's opinion is also largely consistent with T.J.'s therapist, Ms. Humes, who saw T.J. on average two to three times per month from approximately September 2011 through March 2013, and with his high school special education teacher, Ms. Caldwell, who saw T.J. every day for two classes during the 2012-2013 school year and who rendered the most recent opinion in the record. This consistency is significant because the ALJ relied on evidence of improvement during the 2012-2013 school year to discount Dr. Bennett's and Ms. Humes' opinions. To the contrary, despite improvement, Ms. Humes and Ms. Caldwell, who saw T.J. frequently during this time period, still believed that T.J. had marked to extreme limitations in certain domains. Dr. Bennett, Ms. Humes, and Ms. Caldwell all agreed that T.J. had either marked or extreme limitations in "attending and completing tasks," "caring for yourself," and "health and physical well-being." Further, both Dr. Bennett and Ms. Caldwell opined that T.J. had marked limitations in "acquiring and using information," and while it appears Ms. Humes inadvertently failed to check the level of limitation T.J. faced in that functional domain, she wrote, "poor memory retention, poor concentration, poor comprehension," which his consistent with what Dr. Bennett wrote. [Tr. 489, 492]. There are also instances where Dr. Bennett opined that T.J. was less limited in certain areas, suggesting that Dr. Bennett's opinion is not exaggerated or outside of the range of opinions in the record. For instance, Dr. Bennett opined that T.J. was less than markedly limited in "interacting and relating with others" and in "moving about and manipulating objects," while Ms. Humes and Ms. Caldwell opined that T.J. was markedly limited. While Ms. Kistenmacher, T.J.'s middle school special education teacher, opined that T.J. was either

less than markedly limited or not limited in all functional domains, her opinion is inconsistent with Dr. Bennett's opinion, Ms. Humes' opinion, and Ms. Caldwell's opinion. Further, other than the opinion of the non-examining state agency consultants, whose opinion does not constitute substantial evidence, there is no other medical opinion in the record that conflicts with Dr. Bennett's assessment.

The ALJ also remarked that Dr. Bennett did not directly treat T.J. for his mental health impairments since Dr. Bains took over management of his medication a month before T.J. filed his application. *Id.* While it is true that Dr. Bains handled T.J.'s medication, Dr. Bennett's records from 2011 and 2012 repeatedly state that T.J. is visiting for an evaluation or follow-up of his depression and bipolar disorder, even while Dr. Bains was handling medication. [Tr. 421, 423, 427, 431, 433]. Some evidence may support the ALJ's determination that Dr. Bennett's opinion was due "little weight," but substantial evidence does not.

The opinion of T.J.'s therapist, Alicia Humes, LMSW, was also given "little weight." *Id.* The ALJ stated that Ms. Humes only provided limited treatment records, that the records provided reflect that T.J. was adequately groomed and had a stable mood, and that T.J. did not see Ms. Humes on a regular basis. *Id.* While Ms. Humes is not an "acceptable medical source" whose opinion are due controlling weight, her opinion may still be considered and weighed by the ALJ. There are limited treatment records from Ms. Humes, but as discussed above, her opinions are largely consistent with Dr. Bennett's opinions. As to the ALJ's observation that the limited records from Ms. Humes state that he is adequately groomed and has a stable mood, these same records

12

state that T.J. has inappropriate coping skills, panic attacks, episodes of aggression, consistent emotional outbursts, feelings of isolation, anxiety, and poor social skills. [Tr. 570-72]. Ms. Humes also submitted a letter detailing several warning signs of violence exhibited by T.J. [Tr. 569]. The ALJ also stated that Ms. Humes' opinion was due "little weight" because "the claimant's mother further testified that the claimant does not see Ms. Humes on a regular basis but, rather, only when he desires to talk to her." [Tr. 22]. T.J.'s mother testified that for the summer, Ms. Humes was leaving their therapy schedule up to T.J. but that T.J. regularly requested to see her and saw her on average two to three times per month. [Tr. 90, 570]. The reasons provided by the ALJ for affording Ms. Humes' opinion "little weight" are not supported by substantial evidence.

While the record suggests that T.J. experienced improvement during the 2012-2013 school year, it is unclear what the extent of that improvement was and whether it supports a finding that T.J. had no extreme limitations of less than two marked limitations as required for a conclusion that he is not disabled under 20 C.F.R. §§ 416.924, 416.926(a). The reasons provided by the ALJ for affording the opinion of T.J.'s treating physician, Dr. Bennett, and his counselor, Ms. Humes, "little weight" are not supported by substantial evidence. Remand is necessary so that the ALJ may reevaluate Dr. Bennett's and Ms. Humes' opinion and either afford them significant weight or provide reasons for not doing so that are consistent with substantial evidence in the record and with this Order. Further, while the record shows some improvement, it is unclear to what extent the improvement affects T.J.'s ability to function within the six functional equivalent domains. Therefore, on remand, the ALJ shall seek an opinion from Dr.

Bains, who has managed T.J.'s medication since 2011 and who has consistently documented progress, regression, medication adjustments, and the reports of T.J. and his mother.  The ALJ shall consider Dr. Bains a treating source and shall weigh his opinion in accordance with 20 C.F.R. § 416.927 and Eighth Circuit precedent.

### III.   Conclusion

For the reasons set forth above, the Commissioner's decision is reversed, and the case is remanded for further consideration consistent with this Order.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated:  March 10, 2015
Jefferson City, Missouri